UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

GUIDO BINI,

               Plaintiff,

    v.

CITY OF VANCOUVER, et al.,

               Defendants.

CASE NO. C16-5460 BHS

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter comes before the Court on the joint motion for summary judgment (Dkt. 28) of City of Vancouver ("City") and Officer Sandra Aldridge ("Aldridge") (collectively "Defendants"). Also before the Court is Plaintiff Guido Bini's ("Plaintiff") motion to continue. Dkt. 44. The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby grants the motion for summary judgment in part, denies it in part, and declines to exercise supplemental jurisdiction over Plaintiff's surviving state law claims.[1]

---

[1] Also before the Court are Defendants' various motions to strike on the bases that Plaintiff has either exceeded court rules on page length or has failed to properly support factual assertions in his pleadings with actual evidence or affidavits. *See* Dkt. 49 at 11; Dkt. 59. However, even considering the excess briefing, and even if the statements about which Defendants complain were properly supported, it would not change the Court's analysis or conclusion. The motions to strike are therefore **DENIED**.

# I. PROCEDURAL HISTORY

On June 9, 2016, Plaintiff filed his complaint against Defendants claiming violations of constitutional rights actionable under 42 U.S.C. § 1983, a violation of the Washington State Criminal Records Privacy Act ("CRPA"), abuse of process, false arrest, false imprisonment, and negligence. Dkt. 1.

On September 1, 2016, the City moved to dismiss. Dkt. 9. On October 28, 2016, the Court granted the motion in part and denied it in part, dismissing Plaintiff's claims against the City but granting Plaintiff leave to amend. Dkt. 16. On December 15, 2016, Plaintiff filed an amended complaint. Dkt. 22.

On March 2, 2017, Defendants jointly moved for summary judgment. Dkt. 28. On March 20, 2017, Plaintiff responded. Dkt. 41. On March 24, 2017, Defendants replied. Dkt. 49.

On March 23, 2017, Plaintiff moved to continue the Court's consideration on the motion for summary judgment. Dkt. 44. On April 3, 2017, Defendants responded. Dkt. 52. On April 7, 2017, Plaintiff replied. Dkt. 56. On April 11, 2017, Defendants filed a surreply. Dkt. 59.

# II. FACTUAL BACKGROUND

In 2014, Aldridge was monitoring jail communications between Plaintiff and Garrett Smith while Garrett Smith was awaiting a trial which would ultimately result in his conviction for second degree assault and the attempted murder of his wife, Sheryl Smith ("Smith"). Dkt. 22 at 3; Dkt. 29 at 2–4; Dkt. 31-2; Dkt. 9-1.

At that time, and as a result of Plaintiff's communications with Garrett Smith, Plaintiff's girlfriend began publishing and maintaining a webpage called "Garrett's Voice" (the "blog"). Dkt. 22 at 3; Dkt. 30-1 at 62, 74–78. The website made many disparaging statements about Sheryl Smith's character, claiming that she was a "fraud," "an excessive drinker," and that the horrendous injuries inflicted by Garrett Smith were actually the result of her "own alcohol-induced rage." Dkt. 29-2; Dkt. 30-1 at 58–59; Dkt. 31 at 3; Dkt. 31-1 at 4–5. *See also* Dkt. 32 at 9 (documenting Smith's injuries). The website was also highly critical of Aldridge, the Vancouver Police Department, the judiciary in Clark County and their work on Garrett Smith's case. Dkt. 22 at 3; Dkt. 31-2. At the request of Garrett Smith, Plaintiff also began contacting common business associates and family members of Sheryl and Garrett Smith. Dkt. 30-1 at 76–77, 79–82. Plaintiff's contact with these persons included sending them emails with links to and copies of the information posted on the blog. Dkt. 25 at 3. *See also* Dkt. 30-1 at 76–77, 79–82. Based on the content of the blog, Plaintiff's jail communications with Garrett Smith, and complaints by Smith, Aldridge started investigating Plaintiff for cyberstalking in violation of RCW 9.61.260. Dkt. 24 at 3–4; Dkt. 29 at 3.

On April 29, 2014, Smith obtained a temporary anti-harassment order against Plaintiff. Dkt. 30-2 at 2–3. Later that day, Aldridge went to Plaintiff's home, served Plaintiff with the protective order, and issued a warning regarding the blog. Dkt. 24 at 3–4; Dkt. 29 at 4. The blog was temporarily removed, but was subsequently republished. *Id.* On May 7, 2014, Aldridge arrested Plaintiff, improperly concluding that he had committed felony cyberstalking in violation of RCW 9.61.260(3). Dkt. 24 at 4. Felony

cyberstalking under RCW 9.61.260(3) requires a previous conviction of a crime of harassment as defined under RCW 9A.46.060 as a mandatory element, while cyberstalking as a gross misdemeanor under RCW 9.61.260(1) does not. *See* RCW 9.61.260. Plaintiff has not been convicted of a crime of harassment as defined under RCW 9A.46.060. Dkt. 22 at 4. Although Aldridge was wrong in her assessment that Plaintiff had committed *felony* cyberstalking, this assessment and her decision to arrest were based on her belief that Plaintiff had violated a temporary anti-harassment order. Dkt. 24 at 4. On May 12, 2014, a county deputy prosecutor declined to file an information against Plaintiff. Dkt. 34-1.

On May 28, 2014, Smith obtained an anti-harassment order against Plaintiff. Dkt. 31 at 5; Dkt. 30-4. At the hearing on the order, Plaintiff appeared and testified. *See* Dkt. 30-1. In his testimony, Plaintiff made statements indicating that (1) he had consulted with his girlfriend regarding information to post on the blog about Smith, (2) he contacted at least 12 friends and family members of Smith in order to disseminate the blog at the direction of Garrett Smith, and (3) he understood how the information he disseminated would be embarrassing and harassing in nature. *Id.* at 76–77, 79–82. Notably, on appeal of the anti-harassment order, the Clark County Superior Court concluded that it was lawful for the County District Court to enter a protective order against Plaintiff, stating:

> Mr. Bini admitted that he contacted these individuals for the purpose of "mak[ing] them aware of the blog"; "mentioning" the underlying criminal proceeding against Mr. Smith; and informing them that Ms. Smith was a fraud, a drunk and subject to habitual drinking rages. Furthermore, Mr. Bini admitted he had no knowledge whether or not these allegations were true, and admitted that these statements were embarrassing and harassing in nature.

With respect to the publication of the blog, Mr. Bini further admitted that he provided the details to his so called girlfriend to post certain information about Ms. Smith, and had discussions with her to post said derogatory comments.

The evidence presented at the district court level showed that Ms. Smith felt intimidated, harassed, and humiliated. The conduct engaged by Mr. Bini served no lawful purpose.

Dkt. 30-5 at 9.

Based on the statements made at the May 28, 2014, hearing, combined with the information she already had, Aldridge continued to pursue the prosecution of Plaintiff for cyberstalking. On May 30, 2014, after receiving a copy of the hearing transcript, Aldridge prepared a supplemental probable cause statement and issued a "Be on the Look Out" ("BOLO") advising officers who came into contact with Plaintiff that there was probable cause for his arrest. Dkts. 25, 26.

On June 10, 2014, Plaintiff filed a complaint with the city police department, complaining that Aldridge had arrested him on May 7, 2014, without probable cause. Dkt. 42-4. On July 1, 2014, the complaint was forwarded to Aldridge by her supervisor. *Id.* at 2. While there is no further admissible evidence on the matter, Plaintiff's amended complaint alleges that the reviewing law enforcement authority ultimately dismissed the complaint on October 22, 2014, concluding that the complaint was "unfounded" and that there was "no merit to the complaint by GUY BINI." Dkt. 22 at 8.

On July 3, 2014, Aldridge met with the Vancouver City Attorney to discuss whether the prosecutor would pursue charges against Plaintiff for misdemeanor cyberstalking. Dkt. 27 at 5; Dkt. 29 at 6; Dkt. 46 at 2–4. The City Attorney declined on the basis that, although he believed there was probable cause to arrest Plaintiff, he would

require additional witnesses that were willing to testify before he could prove every element of cyberstalking beyond a reasonable doubt. Dkt. 33; Dkt. 46 at 3. Accordingly, the City Attorney requested that Aldridge find additional witnesses who were willing to testify to receiving multiple emails from Plaintiff before he would file an information and pursue charges. Dkt. 29 at 6; Dkt. 46 at 2–4.

After the City Attorney declined to prosecute without additional witnesses, Aldridge was unable to locate any additional witnesses who were willing to testify that they had received multiple emails from Plaintiff. Dkt. 29 at 6. Nonetheless, Aldridge did not remove from the computer system the BOLO notifying her fellow officers that there was probable cause to arrest Plaintiff. *Id.* On October 24, 2014, city police officers arrested Plaintiff pursuant to the outstanding BOLO. *Id.* On the way to the jail, the arresting officers contacted Aldridge to inform her that they had arrested Plaintiff under the outstanding BOLO, whereupon Aldridge informed them that Plaintiff should be released. *Id.*; Dkt. 42 at 2.[2] The officers then immediately released Plaintiff and returned him to his home. Dkt. 22 at 9; Dkt. 29 at 6.

On November 10, 2014, the City Attorney reached a final decision not to file charges against Plaintiff for cyberstalking. Dkt. 42-3. In a letter informing Smith that the City would not prosecute Plaintiff, a city attorney stated:

---

[2] The Court notes that Plaintiff has failed to provide a copy of the incident report that he quotes in his declaration. Accordingly, the statement in paragraph 7 of his declaration is hearsay. Nonetheless, the Court cites the declaration here to show that even Plaintiff's own declaration is consistent with other evidence on the record and shows that there is no genuine dispute of material fact.

> Prosecution is declined. There is insufficient evidence to charge
> [Guy Bini] with a crime. This does not imply that the City of Vancouver
> does not believe that the events occurred as relayed to the police; we simply
> cannot pursue criminal charges based on the evidence given. The decision
> does not affect any form of civil litigation you may wish to pursue for these
> allegations.

*Id.* at 2.

On March 25, 2015, Aldridge provided Sheryl Smith's attorney with a declaration and two non-redacted police incident reports she had authored in relation to her investigation and arrest of Plaintiff. Dkt. 29-7 at 5. Although the copies of the incident reports actually attached to that declaration have not been submitted to the Court, Plaintiff argues that the reports included non-redacted personal identifiers, including Plaintiff's date of birth, physical description, driver's license number, address, and phone number. Dkt. 22 at 9–11. *See also* Dkts. 24, 27.[3] Aldridge provided the incident reports to Smith for the purpose of helping Smith obtain a protective court order in the divorce proceedings between her and her husband. Dkt. 31 at 5. Smith sought the protective order to prevent her husband and Plaintiff from using discovery requests to obtain documents they might post on the blog and further disseminate to her associates and family. Dkt. 31-5. In her motion for the protective order, Smith stated:

> On or about June 3, 2013, I was brutally beaten and left for dead by
> [my husband, Mr. Smith]. Around March, 2014 during Mr. Smith's
> incarceration and awaiting trial, he contacted a gentlemen by the name
> Guido A. Bini. Mr. Bini began acting as Mr. Smith's proxy from that point
> on.

---

[3] These are, presumably, regenerated copies of the reports that Aldridge disclosed to Smith by attaching them to her declaration.

Mr. Bini began by contacting my past employer, Keller Williams and the Department of Licensing, alleging that I was a criminal and should not be allowed a real estate license. He went as far as filing an actual complaint with the Department of Licensing. In Mr. Bini's complaint he claimed I was selling homes without a license, falsely representing myself, and not using my real name or going by many different aliases . . . .

Mr. Bini continued his harassment by contacting my real estate partners, associates and a client by telephone and then mailing them material he created, stating that I have lied about my injuries I sustained from the Petitioner, my criminal history, I am a dangerous and deceitful person, and that I should not be trusted or believed. He also created a blog putting all his lies on it about me.

\* \* \*

I was granted an Anti-Harassment Order; however, Mr. Bini has appealed the decision, which that matter is still pending. Since the time the Order was entered, Mr. Bini has had his girlfriend by the name of Traci D. Eccles maintaining a blog. The blog is called "Garrett's Voice… The Sequel". This blog shows clips from the Petitioner's criminal trial, passages from my deposition, numerous attacks on my character as well as attacks on the prosecutor and judge.

I am terrified to reveal anything that has to do with me, my life, my career or any connections to anyone for fear of retribution to these business friends, associates, and business firms. It has already been shown that any information I provide will be placed on the blog, misconstrued, or used in furtherance for the attack on my character and my life. I truly feel unsafe! Garrett and his 'team' I feel are out to get me and destroy my credibility in the community.

Dkt. 31-5 at 3–4. The Clark County Superior Court granted her request and issued the protective order. Dkt. 30-6 at 6; Dkt. 30-7.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the

nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine dispute of material fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material factual dispute is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

**B.    42 U.S.C. § 1983 Claims Against Officer Aldridge**

42 U.S.C. § 1983 is a procedural device for enforcing constitutional provisions; the section does not create or afford substantive rights. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). In order to state a claim under § 1983, a plaintiff must demonstrate that (l) the conduct complained of was committed by a person acting under color of state law, and (2) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or by the laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986).

Additionally, "[a] police officer is entitled to qualified immunity in a § 1983 action unless (1) the facts, when taken in the light most favorable to the plaintiff, show that the officer's conduct violated a constitutional right; and (2) the right was clearly established at the time of the alleged misconduct." *Sinclair v. City of Grandview*, 973 F. Supp. 2d 1234, 1246 (E.D. Wash. 2013) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009)). "Courts are 'permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.'" *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (quoting *Pearson*, 555 U.S. at 236).

The inquiry of whether an officer is entitled to qualified immunity "turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Pearson*, 555 U.S. at 244 (quoting *Wilson v.*

*Layne*, 526 U.S. 603, 614 (1999)). This "qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Liberal v. Estrada*, 632 F.3d 1064, 1077 (9th Cir. 2011) (quoting *Rodis v. City of San Francisco*, 558 F.3d 964, 970–71 (9th Cir. 2009), *cert. denied*, 558 U.S. 1110 (2010)).

### 1.     Fourth Amendment Claims

"To prevail on [a] § 1983 claim for false arrest . . . [a plaintiff must] demonstrate that there was no probable cause to arrest him." *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998). Also, "an official with no official authority over another actor can also be liable for that actor's conduct if he induces that actor to violate a third party's constitutional rights, provided that the official possesses the requisite intent, such as retaliatory animus." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 916 (9th Cir. 2012) "[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Id*. at 153. The officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Id*.

In his legal argument, Plaintiff has failed to define the parameters of his claimed Fourth Amendment deprivations, instead stating only generally that Aldridge lacked probable cause to arrest him. *See* Dkt. 41 at 16. However, Plaintiff's statement of facts

indicate that he is bringing Fourth Amendment Claims for (1) his arrest on May 7, 2014, and (2) his arrest on October 24, 2014.

### a.  First Arrest on May 7, 2014

In this case, Aldridge had probable cause to arrest Plaintiff for cyberstalking under RCW 9.61.260 which provides in relevant part:

> (1) A person is guilty of cyberstalking if he or she, *with intent to harass, intimidate, torment, or embarrass* any other person, and under circumstances not constituting telephone harassment, makes an electronic communication to such other person *or a third party*:
> * * *
> (b) Anonymously or repeatedly whether or not conversation occurs . . . .
> * * *
> (2) Cyberstalking is a gross misdemeanor, except as provided in subsection (3) of this section.
> * * *
> (5) For purposes of this section, "electronic communication" means the transmission of information by wire, radio, optical cable, electromagnetic, or other similar means. "Electronic communication" includes, but is not limited to, electronic mail, internet-based communications, pager service, and electronic text messaging.

RCW 9.61.260 (emphasis added).

Plaintiff sent emails to Smith's family and several of her business associates with attachments and links to a blog that grossly disparaged Smith's character, claiming that she was a "fraud," "an excessive drinker," and that the injuries she sustained at the hands of her incarcerated husband were actually the result of her "own alcohol-induced rage." Dkt. 29-2; Dkt. 30-1 at 58–59; Dkt. 31 at 3; Dkt. 31-1 at 4–5. The content of the blog appears to have been directed by Plaintiff, although Plaintiff claims that it was actually written and uploaded entirely by his girlfriend. Dkt. 22 at 3; Dkt. 30-1 at 62, 74–78. This

1  evidence provided Aldridge with probable cause to believe that, on more than one

2  occasion, Plaintiff had sent electronic communications to third parties with whom Smith

3  had close ties for the purpose of harassing, intimidating, tormenting, or embarrassing

4  Smith. Absent preexisting authority to the contrary, it would be reasonable for an officer

5  to construe the statute in a manner that does not require that the multiple communications

6  be sent to the same third party, although Smith's testimony indicates that at least one

7  business associate was contacted on more than a single occasion. *See* Dkt. 31 at 3.

8      Also, the Court rejects Plaintiff's argument that his intent was to exculpate

9  Smith's husband from the charges against him (rather than harass Smith) and that

10  Aldridge lacked any evidence to the contrary. *See* Dkt. 41 at 2, 8. The fact that Plaintiff

11  sent such salacious accusations to Smith's business associates is alone sufficient to justify

12  Aldridge's reasonable belief that the blog and the messages disseminating it were

13  intended to harass, torment, or embarrass Smith. Furthermore, because questions on

14  probable cause are determined from the objective viewpoint of a reasonable officer, the

15  Court need not consider the actual existence or nonexistence of Plaintiff's *mens rea* or

16  specific intent. *See United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)

17  ("Probable cause is an objective standard."). Therefore, because Aldridge had probable

18  cause to believe that Plaintiff had committed the misdemeanor of cyberstalking,

19  Plaintiff's § 1983 claim against Aldridge for false arrest must fail.

20      Finally, the fact that Aldridge arrested Plaintiff for *felony* cyberstalking, which

21  includes the additional element that the suspect have a previous harassment conviction or

22  has made a death threat, is irrelevant to the Court's analysis. It is well established that "if

the facts support probable cause to arrest for one offense, the arrest is lawful even if the officer invoked, as the basis for the arrest, a different offense as to which probable cause was lacking." *United States v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016).

### b. Second Arrest on October 24, 2014

To the extent Plaintiff claims that Aldridge violated his Fourth Amendment rights when he was arrested on October 24, 2014, his argument can be based on the theories that Aldridge (1) improperly issued a BOLO for Plaintiff's arrest, or (2) did not withdraw the BOLO after speaking with the City Attorney's Office and learning that the prosecutor would not pursue the case without additional witnesses that were willing to testify. *See* Dkt. 41 at 10–11; Dkt. 29 at 6. However, the Court concludes that Plaintiff's arrest on October 24, 2014, was also based on probable cause.

Although Plaintiff was released after his first arrest, this does not mean that Aldridge lacked probable cause to put out the BOLO that led to Plaintiff's second arrest. On May 30, 2014, two days after the hearing where Smith obtained a protective order against Plaintiff, Aldridge prepared a supplemental probable cause declaration based on Plaintiff's in-court statements and put out the BOLO. Dkt. 29 at 5. Those statements included Plaintiff's testimony that (1) he had directed his girlfriend to post information about Smith on the blog, (2) he contacted—at the direction of Smith's abusive, incarcerated husband—at least 12 friends and family members of Smith to disseminate the blog, and (3) that he knew the information he disseminated would be embarrassing and harassing in nature. Dkt. 25 at 3. *See also* Dkt. 30-1 at 76–77, 79–82. These statements, in connection with the information Aldridge already possessed, further

strengthened the preexisting probable cause to arrest Plaintiff for cyberstalking. Therefore, Aldridge did not violate the Fourth Amendment when she issued a BOLO for Plaintiff's arrest.

Plaintiff has failed to offer any authority suggesting that a law enforcement officer must rescind a BOLO based on probable cause when a prosecutor requests additional evidence before filing an information and pursuing formal charges. The Court is unaware of any such authority. *See Anderer v. Jones*, 385 F.3d 1043, 1052 (7th Cir. 2004), *amended on denial of reh'g*, 412 F.3d 794 (7th Cir. 2005); *McDougal v. Odom*, 850 F. Supp. 784, 785 (E.D. Ark. 1994), *aff'd*, 37 F.3d 1502 (8th Cir. 1994) ("The ultimate *nolle prosequi* of the charge against plaintiff is of no consequence in the determination of the validity of his arrest."); *Egolf v. Witmer*, 421 F. Supp. 2d 858, 867 (E.D. Pa. 2006), *aff'd*, 526 F.3d 104 (3d Cir. 2008) ("[T]he District Attorney's subjective view about the advisability of prosecution does not impugn the Troopers' correct determination that they had probable cause to arrest Plaintiffs.").

Moreover, "[u]nlike probable cause to search, probable cause to arrest, once formed will continue to exist for the indefinite future, at least if no intervening exculpatory facts come to light." *See United States v. Watson*, 423 U.S. 411, 449 (1976) (Marshall, J., dissenting) (citing cases); *United States v. Bizier*, 111 F.3d 214, 219 (1st Cir.1997); *Baribeau v. City of Minneapolis*, 596 F.3d 465, 489–90 (8th Cir. 2010); *United States v. Tehfe*, 722 F.2d 1114, 1119 (3d Cir. 1983) ("The concept of staleness is important in determining probable cause for a search but is not generally applicable to the showing required to issue an arrest warrant."). Therefore, to the extent the BOLO was

issued pursuant to evidence that strengthened Aldridge's reasons for arresting Plaintiff the first time—an arrest that the Court has already concluded was supported by probable cause—the second arrest was likewise supported by probable cause.

### c. "Misdemeanor Presence" Rule

Plaintiff's argument that Aldridge arrested him for a misdemeanor that was not committed in her presence is irrelevant to his claims under § 1983. The Ninth Circuit "has held that the violation of the Washington statute precluding arrest for a misdemeanor unless the officer observes the crime does not deprive a citizen of a constitutional right." *Hall v. Hughes*, 232 Fed. Appx. 683, 684–85 (9th Cir. 2007) (citing *Alford v. Haner*, 446 F.3d 935, 937 n.2 (9th Cir. 2006); *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). *See also Barry v. Fowler*, 902 F.2d 770, 772–73 (9th Cir. 1990). *See also State v. Walker*, 157 Wn.2d 307, 322 (2006) ("We find no constitutional basis to support an absolute right to be free from warrantless misdemeanor arrests in the state of Washington."). Accordingly, to the extent that Plaintiff claims the lack of a warrant resulted in his arrests being actionable under § 1983, this claim fails as a matter of law. *See* Dkt. 41 at 25.

### 2. First Amendment Claims

"In order to demonstrate a First Amendment violation, a plaintiff must provide evidence showing that 'by his actions [the defendant] deterred or chilled [the plaintiff's] . . . speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct.'" *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir. 1994)). Additionally, the

speech at issue must be "protected speech." *See State v. Homan*, 191 Wn. App. 759, 768

(2015), *as corrected* (Feb. 11, 2016) ("The First Amendment does not protect certain

types of speech, including libelous speech, fighting words, incitement to riot, obscenity,

and child pornography, and true threats.").[4]

       The Ninth Circuit has on at least one occasion recognized that there is a "clearly

established First Amendment right to be free from police action motivated by retaliatory

animus, even if probable cause existed for that action." *Ford v. City of Yakima*, 706 F.3d

1188, 1190 (9th Cir. 2013). However, in a subsequent decision, the Ninth Circuit has also

held that "there [is no] clearly established First Amendment right to be free from a

retaliatory arrest that is otherwise supported by probable cause" and if a "seizure and

arrest were supported by probable cause, the officers are entitled to qualified immunity."

*Acosta v. City of Costa Mesa*, 718 F.3d 800, 825 (9th Cir. 2013) (citing *Reichle v.*

*Howards*, 566 U.S. 658, 132 S. Ct. 2088, 2097 (2012)). The conflict between these two

cases is sufficient to indicate that a person does not have a clearly established First

Amendment right to be free from retaliatory arrests otherwise supported by probable

cause. The Court has already determined that probable cause existed to arrest Plaintiff for

cyberstalking. Therefore, Aldridge is entitled to qualified immunity from Plaintiff's First

Amendment claim based on those arrests.

---

    [4] Defendants do not argue that Plaintiff has failed to present or allege any protected speech, even though Plaintiff continues to assert that he never contributed to the blog and his emails appear to constitute harassment under RCW 9.61.260. Therefore, the Court will not consider this issue.

**C.      Municipal Liability Under 42 U.S.C. § 1983**

To survive summary judgment on a § 1983 claim against a municipality, Plaintiff must show sufficient evidence to support a reasonable inference that the execution of a policy, custom, or practice was the "moving force" that resulted in the deprivation of his constitutional rights. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–92 (1978).

**1.      Fourth Amendment Claims**

When there is no underlying constitutional deprivation, a claim asserting municipal liability under § 1983 must necessarily fail. *See Quintanilla v. City of Downey*, 84 F.3d 353, 356 (9th Cir. 1996) (no recovery on § 1983 claim against city absent showing that plaintiff's arrest violated his constitutional rights). Because Plaintiff's arrests were supported by probable cause, he cannot show that he suffered a Fourth Amendment deprivation. Therefore the Court must grant summary judgment in favor of the City on Plaintiff's Fourth Amendment claims under § 1983.

**2.      First Amendment Claims**

Although Plaintiff's First Amendment claim against Aldridge is barred by qualified immunity, "municipalities have no immunity from damages liability flowing from their constitutional violations . . . ." *Owen v. City of Indep., Mo.*, 445 U.S. 622, 657 (1980). Therefore, because the Court has decided Plaintiff's First Amendment claims against Aldridge based on the issue of qualified immunity, that analysis is not dispositive of Plaintiff's First Amendment claims against the City.

"While local governments may be sued under § 1983, they cannot be held vicariously liable for their employees' constitutional violations." *Gravelet-Blondin v.*

*Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013). There are three established scenarios in which a municipality may be liable for constitutional violations under § 1983. "First, a local government may be held liable 'when implementation of its official policies or established customs inflicts the constitutional injury.'" *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2012) (quoting *Monell*, 436 U.S. at 708). Second, Plaintiff can prevail on a § 1983 claim against the City by identifying acts of omission, such as a pervasive failure to train its employees, "when such omissions amount to the local government's own official policy." *Id*. Finally, the City "may be held liable under § 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Clouthier*, 591 F.3d at 1250 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992).

For the reasons stated below, the Court finds that Plaintiff has failed to state a claim or provide any evidence that would support a theory that any custom, policy, action, or omission by the City was the "moving force" behind a violation of Plaintiff's First Amendment rights.

### a.   Implementation of Official Policy or Practice

In order for a municipality to be liable under § 1983 for an official policy or practice, the "'policy or custom' must generally be one adopted and expressly set forth, but a municipal policy 'may [also] be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.'" *Morales v. Fry*, C12-2235-JCC, 2014 WL 1230344, at *13

(W.D. Wash. Mar. 25, 2014) (quoting *Nadell v. Las Vegas Metro. Police Dep't.*, 268 F.3d 924, 929 (9th Cir. 2001)). Plaintiff has failed to allege or produce any evidence that the City has an express policy or widely adopted practice that would cause Aldridge to conduct a retaliatory arrest for speech protected by the First Amendment.

### b. Failure to Train

To allege municipal liability under § 1983 for failure to train, Plaintiff must allege: (1) the existing training program is inadequate in relation to the tasks the particular officers must perform; (2) the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact; and (3) the inadequacy of the training actually caused the deprivation of the alleged constitutional right. *Merritt v. Cty. of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989). "[T]he need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 380 (1989). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "Under this standard, [Plaintiff] must [provide] facts to show that the [Defendants] disregarded the known or obvious consequence that a *particular* omission in their training program would cause [municipal] employees to violate citizens' constitutional rights." *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1159 (9th Cir. 2014) (quotation marks omitted and emphasis added). *See, e.g.*, *McFarland v. City of Clovis*, 163 F. Supp. 3d 798, 806 (E.D. Cal. 2016) ("Alleging that training [for arrest procedures] is 'deficient' or 'inadequate'

without identifying a specific inadequacy is conclusory and does not support a plausible claim.") (citing *Young v. City of Visalia*, 687 F. Supp. 2d 1141, 1149 (E.D. Cal. 2009)); *Case v. Kitsap Cty. Sheriff's Dep't*, 249 F.3d 921, 932 (9th Cir. 2001) ("[N]or can [municipal] liability be predicated on the isolated sporadic events . . . ."); *Booke v. Cty. of Fresno*, 98 F. Supp. 3d 1103, 1128 (E.D. Cal. 2015) ("[A] plaintiff generally must show other instances of peace officers violating constitutional rights in order to show deliberately indifferent training.").

Here, Plaintiff has failed to complain of any specific training deficiencies, let alone articulate a plausible connection between such deficiencies and his asserted First Amendment rights. Absent evidence (or even allegations) of specific shortcomings in the training of police officers that would directly lead to the type of retaliatory First Amendment violation Plaintiff seeks to establish, Plaintiff cannot prevail on a First Amendment claim against the City for failure to train.

### c. Ratification

"Ratification . . . generally requires more than acquiescence." *Sheehan v. City & Cty. of San Francisco*, 743 F.3d 1211, 1231 (9th Cir. 2014), *rev'd in part on other grounds sub nom. City & Cty. of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765 (2015). "Rather, to state a section 1983 claim under a ratification theory, a plaintiff must sufficiently allege that a policymaker 'made a deliberate choice to endorse' the . . . unlawful actions." *Diamond v. United States*, ED CV 14-01922-VBF, 2015 WL 11215851, at *9 (C.D. Cal. May 15, 2015) (quoting *Sheehan*, 743 F.3d at 1231). The mere allegation that an officer was not reprimanded or provided with additional training

cannot support a theory of ratification. *Morales v. Fry*, C12-2235-JCC, 2014 WL

1230344, at *14 (W.D. Wash. Mar. 25, 2014); *Clouthier*, 591 F.3d at 1253–54 (holding

that a failure to discipline employees, without more, was insufficient to establish

ratification).

In this case, Plaintiff alleges and provides evidence to support a theory that the

City ratified Aldridge's decision that probable cause existed for Plaintiff's arrest. Dkt. 22

at 6, 10. Specifically, Plaintiff claims that the City "took no action regarding

ALDRIDGE's misconduct," Dkt. 22 at 10, and that the County rejected Plaintiff's

complaint to the police department that "he had been arrested without probable cause,"

Dkt. 22 at 6. However, for liability to attach under a theory of ratification, Plaintiff must

show that a decision-making official "ratified [Aldridge]'s unconstitutional decision or

action *and the basis for it*." *Clouthier*, 591 F.3d at 1250 (quotation omitted and emphasis

added). While these facts would be relevant to a *Monell* claim based on the violation of

Plaintiff's Fourth Amendment rights, Plaintiff fails to claim or provide any evidence that

the City ratified the arrests to the extent that they may have been the product of a

retaliatory motive. *See* Dkt. 22 at 4–10.

In his response to summary judgment, Plaintiff cursorily argues that "[t]he

ratification allegations [in the amended complaint] involved both Aldridge's 4th

[A]mendment violations and her 1st Amendment violations." Dkt. 41 at 26. However,

Plaintiff fails to quote or even cite any portion of the amended complaint that does so,

and an actual review of the amended complaint in this case and the complaint he filed

with the city police department reveals otherwise. *See* Dkt. 22 at 4–10; Dkt. 42-4. The

1  Court already granted Plaintiff an opportunity to amend his complaint in order to remedy

2  this very shortcoming. *See* Dkt. 16 at 5–11, 15.

3      Having failed to claim or produce any evidence (or even allege in his amended

4  complaint) that the County ratified a retaliatory motive for Plaintiff's arrest, Plaintiff

5  cannot prevail on a § 1983 claim under a theory that the City ratified a violation of his

6  First Amendment rights.

7  **D.    State Law Claims of False Arrest and Imprisonment**

8      Under Washington State law, it is generally stated that "probable cause is a

9  complete defense to an action for false arrest and imprisonment." *Hanson v. City of*

10 *Snohomish*, 121 Wn.2d 552, 563 (1993). However, even where probable cause exists for

11 a misdemeanor, a state law claim for false arrest may arise if an officer violates RCW

12 10.31.100 by conducting a warrantless arrest for a misdemeanor that was not committed

13 in their presence. *Staats v. Brown*, 139 Wn.2d 757, 768–70, 777–80 (2000), *as amended*

14 (Jan. 24, 2000).

15     In this case, it is undisputed that Aldridge arrested Plaintiff without a warrant for a

16 misdemeanor that was not committed in her presence. Nonetheless, Aldridge may

17 reasonably have believed that she possessed authority to arrest Plaintiff without a

18 warrant. Indeed, Police may arrest a suspect for a gross misdemeanor without a warrant if

19 there is probable cause to believe that the suspect has violated an anti-harassment order.

20 RCW 10.31.100(10). Additionally, Washington State has created a statutory immunity so

21 that "[n]o police officer may be held criminally or civilly liable for making [such] an

22

arrest . . . if the police officer acts in good faith and without malice." RCW

10.31.100(16).

Smith obtained a temporary anti-harassment order against Plaintiff on April 29,

2014. Dkt. 30-2 at 2–3. Later that day, Aldridge served Plaintiff with the protective order,

advised him that he was being investigated for cyberstalking, and suggested that he

remove the blog. Dkt. 24 at 4; Dkt. 29 at 4. Although public access to the blog was

temporarily blocked once the protective order was served on Plaintiff, the blog was

reopened only several days later. Dkt. 24 at 4; Dkt. 29 at 4. Therefore, Aldridge's arrest

of Plaintiff may have been based on a good faith belief that the republishing of the blog

constituted an attempt by Plaintiff to harass Smith in violation of the protective order

against him. Dkt. 24 at 4. In fact, in the incident report setting out the basis for Plaintiff's

first arrest, Aldridge expressly stated that the decision to arrest Plaintiff was based on her

belief that Plaintiff was in violation of an anti-harassment order. Dkt. 24 at 4 ("I

determined from my investigation that there was probable cause to arrest Guy Bini for

Cyberstalking . . . as Mr. Bini is specifically named as the respondent in an anti-

harassment order with Sheryl Smith listed as the protected party.").

However, Defendants have failed to argue that Aldridge is entitled to statutory

immunity under RCW 10.31.100(16) or qualified immunity under the Washington State

common law. *See Staats*, 139 Wn.2d at 779 (noting "the difference between that state

immunity available under *Guffey* and the qualified immunity available under federal law

from suit under § 1983."). The Court refuses to engage in such an analysis and render a

decision on this basis *sua sponte*. Accordingly, because Aldridge arrested Plaintiff

1  without a warrant for a misdemeanor not committed in her presence, the Court denies the

2  motion for summary judgment on Plaintiff's state law claims of false arrest and false

3  imprisonment.

4  **E.  Abuse of Process**

5       A claim for abuse of process has two elements:

6       (1) the existence of an ulterior purpose—to accomplish an object not within
         the proper scope of the process—and (2) an act in the use of legal process
7        not proper in the regular prosecution of the proceedings.

8  *Hough v. Stockbridge*, 152 Wn. App. 328, 344 (2009) (quoting *Fite v. Lee*, 11 Wn. App.

9  21, 27 (1974)).

10      Defendants argue that a claim for abuse of process cannot exist where they have

11  not filed and commenced any court proceeding against the Plaintiff. *See* Dkt. 28 at 23–

12  24. However, the cases that Defendants cite for this proposition do not create such a

13  bright-line rule. Instead, these cases explain that, where an abuse of process claim is

14  based on the misuse of a lawsuit, the Plaintiff must provide evidence of a separate act

15  empowered by the lawsuit beyond just the filing of a frivolous lawsuit itself. *See Batten*

16  *v. Abrams*, 28 Wn. App. 737, 748 (1981).

17      Nonetheless, while there are very few Washington cases interpreting what

18  constitutes "legal process" for the purpose of an abuse of process claim, other

19  jurisdictions clearly indicate that "the tort of abuse of process 'requires misuse of a

20  *judicial* process.'" *Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d

21  1019, 1037 (9th Cir. 2008) (quoting *Stolz v. Wong Commc'ns Ltd. P'ship*, 25 Cal. App.

22  4th 1811, 1822 (1994)) (emphasis in original). Plaintiff has failed to allege any actions

1    whereby Defendants instituted or threatened to pursue judicial process to obtain a result

2    not within the proper scope of such process. Nor has Plaintiff offered any argument or

3    evidence in opposition to Defendant's motion for summary judgment on this claim.

4    Accordingly, the Court grants the motion for summary judgment as it pertains to

5    Plaintiff's claim for abuse of process.

6    **F.      Negligence and Public Duty Doctrine**

7            "When the defendant in a negligence action is a governmental entity, the public

8    duty doctrine provides that a plaintiff must show the duty breached was owed to him or

9    her in particular, and was not the breach of an obligation owed to the public in general,

10   i.e., a duty owed to all is a duty owed to none." *Munich v. Skagit Emergency Commc'n

11   Ctr.*, 175 Wn.2d 871, 878 (2012). Plaintiff fails to identify any particular duty owed to

12   him by Defendants, who are a public official and a public entity. In fact, in response to

13   the motion for summary judgment, Plaintiff fails to articulate any specific acts that he

14   claims constitute negligence. *See* Dkt. 41 at 27. Such threadbare recitals are insufficient

15   to withstand a motion to dismiss, let alone a motion for summary judgment.

16           Even if the Court broadly reviews the entire docket and does Plaintiff's work for

17   him, the Court is unable to find any duty or violation thereof upon which Plaintiff could

18   base a viable negligence claim. For instance, to the extent Plaintiff argues that Aldridge

19   was somehow negligent in investigating the credibility of Smith's complaints about

20   Plaintiff, "[a] claim for negligent investigation is not cognizable under Washington law."

21   *Fondren v. Klickitat Cty.*, 79 Wn. App. 850, 862 (1995). Also, any potential negligence

22   claim for Aldridge's failure to remove the BOLO from the police computer system is

likewise barred by the public duty doctrine. *See Vergeson v. Kitsap Cty.*, 145 Wn. App. 526, 533–34 (2008) (holding a public official has no "actionable duty to exercise ordinary care in removing [a] court-quashed warrant from the databases."). Therefore, the Court grants summary judgment in favor of Defendants on Plaintiff's negligence claim.

## G.    Criminal Records Privacy Act Claim

The CRPA generally prohibits the retention or mechanical reproduction of "nonconviction data" by any person other than the subject of the record. RCW 10.97.080. It also prohibits criminal justice agencies from disseminating "criminal history record information" unless the record also states the disposition of the charge when the request for information was made. RCW 10.97.040.

"Nonconviction data," is defined as "all *criminal history record information* relating to an incident which has not led to a conviction or other disposition adverse to the subject, and for which proceedings are no longer actively pending." RCW 10.97.030(8) (emphasis added). "Criminal history record information" is defined as:

> [A]ny information contained in records maintained by or obtained from criminal justice agencies, other than courts, which records provide individual identification of a person together with any portion of the individual's record of involvement in the criminal justice system as an alleged or convicted offender, except . . . [i]ntelligence, analytical, or investigative reports and files.

RCW 10.97.030(4), (4)(h). The CRPA creates a civil cause of action for damages and injunctive relief for violations thereof. RCW 10.97.110.

However, the CRPA also expressly allows criminal agencies to disclose nonconviction data to persons who have suffered injury to the extent it may be useful in obtaining civil relief. Specifically, RCW 10.97.070(1) provides:

> Criminal justice agencies may, in their discretion, disclose to persons who have suffered physical loss, property damage, or injury compensable through civil action, the identity of persons suspected as being responsible for such loss, damage, or injury together with such information as the agency reasonably believes may be of assistance to the victim in obtaining civil redress. Such disclosure may be made without regard to whether the suspected offender is an adult or a juvenile, whether charges have or have not been filed, or a prosecuting authority has declined to file a charge or a charge has been dismissed.

RCW 10.97.070(1). Additionally, state regulations regarding the release of nonconviction data under RCW 10.97.070(1) state as follows:

> A criminal justice agency may, but need not, disclose investigative information to "persons who have suffered physical loss, property damage, or injury compensable through civil action" as contemplated by RCW 10.97.070. Disclosure may be made to the apparent victim; an attorney, parent or guardian acting for the victim or an executor or administrator of an estate of a decedent victim; an authorized agent of the victim; another law enforcement or criminal justice agency making inquiry on behalf of the victim . . . . Investigative information which "... may be of assistance to the victim in obtaining civil redress" may include but is not limited to:
> (1) The name, address, and other location information about a suspect, witness, and in the event of a juvenile, the suspect's parent or guardian;
> (2) Copies of the incident report; and in person review of documents, photographs, statements, and other materials collected in the course of an investigation;
> (3) The location of, and identity of receivers and custodians of stolen property and of property recovered as lost and found property;
> (4) The progress of proceedings arising from the incident and the disposition of any prosecution or other action.
> An agency making a disclosure is not expected to evaluate the merits of a victim's claim for civil relief. Disclosure merely indicates the information has been received and the agency reasonably believes the information may be useful to the recipient in seeking civil redress.

1  WAC 446-20-200.

2      It is clear that the disclosure upon which Plaintiff bases his CRPA claim was in

3  order to help Smith obtain a protective order. Dkt. 31 at 5. Smith sought the protective

4  order to prevent the use of parallel court proceedings to facilitate any further coordinated

5  harassment by Plaintiff and her husband. Dkt. 31-5. The Clark County Superior Court

6  granted her request and issued the protective order. Dkt. 30-6 at 6; Dkt. 30-7. Because the

7  information was disclosed to Ms. Smith, an apparent victim, for the purpose of obtaining

8  a protective order that would help prevent further harassment, it appears that the

9  disclosure may be authorized under RCW 10.97.070(1).

10     On the other hand, Plaintiff points out that the records "were not released in

11 relation to an action against Mr. Bini, but instead were released as part of a Civil Rule

12 26(c) discovery motion in the divorce between Mr. and Mrs. Smith." Dkt. 41 at 26. This

13 adds a wrinkle in the analysis of whether the records were released for the purpose of

14 "civil redress." Additionally, as Plaintiff properly notes, the term "injury *compensable*

15 through civil action" could reasonably be interpreted to refer only to injuries for which

16 one is "statutorily entitled to receive compensation." *Injury*, Black's Law Dictionary

17 (10th ed. 2014). Moreover, to the extent RCW 10.97.070(1) applies to injuries for which

18 redress lies in a "civil action," a "civil injury" is generally defined as "*[p]hysical harm or*

19 *property damage* caused by breach of a contract or by a criminal offense redressable

20 through a civil action." *Id.* (emphasis added). Finally, the Court notes that, even if the

21 incident reports could be released under RCW 10.97.070(1), it appears that Aldridge still

22 failed to properly redact sensitive information like Plaintiff's social security number.

Because the Court has already granted summary judgment in favor of Defendants on all of Plaintiff's federal claims, the Court declines to exercise its supplemental jurisdiction to render a decision on this issue. The Court is unaware of any Washington courts that have addressed this issue, and the parties also have been unable to locate any Washington authority to guide the Court's decision. Accordingly, rather than decide this novel issue of state law, the Court will leave this matter for the State of Washington to resolve in its own courts.

**H.   Supplemental Jurisdiction**

The Court also considers *sua sponte* whether it should exercise supplemental jurisdiction over Plaintiff's remaining claims under state law. *See Sikhs for Justice "SFJ," Inc. v. Facebook, Inc.*, 144 F. Supp. 3d 1088, 1096 (N.D. Cal. 2015) ("[W]here a district court has dismissed all claims over which it has original jurisdiction, it may *sua sponte* decline to exercise supplemental jurisdiction over remaining state law claims.") (quotation omitted). 28 U.S.C. § 1367(c) provides that:

> (c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-
> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) *the district court has dismissed all claims over which it has original jurisdiction*, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367 (emphasis added).

"[E]xercising discretion and deciding whether to decline, or to retain, supplemental jurisdiction over state law claims when any factor in subdivision (c) is

implicated is a responsibility that district courts are duty-bound to take seriously." *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997), *supplemented*, 121 F.3d 714 (9th Cir. 1997), *as amended* (Oct. 1, 1997). "If the federal claims are dismissed before trial, the state law claims 'should' be dismissed." *Grant v. Alperovich*, 993 F. Supp. 2d 1356, 1366 (W.D. Wash. 2014) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). *See also Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988).

The Court has dismissed Plaintiff's federal claims, as explained above. This alone provides the Court with reason to decline supplemental jurisdiction over the remaining state law claims. Further, Plaintiff's CRPA claim presents a novel issue best reserved for the courts of Washington State. Since the motion for summary judgment was brought at such an early stage, the Court does not find that any consideration of convenience to the parties weighs in favor of exercising supplemental jurisdiction. The scheduled trial is still over eight months away. Therefore, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims for false arrest, false imprisonment, and a violation of the CRPA.

**I.      Motion to Continue**

Plaintiff has moved to continue Defendants' motion for summary judgment until further discovery can be completed. The Court may deny or continue a motion for summary judgment if the nonmoving party establishes that it is unable to properly defend against the motion. Fed. R. Civ. P. 56(d). "The requesting party must show: (1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary

judgment." *Fam. Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir.2008). The movant "must make clear what information is sought and how it would preclude summary judgment." *Margolis v. Ryan*, 140 F.3d 850, 853 (9th Cir.1998). "Failure to comply with these requirements is a proper ground for denying discovery and proceeding to summary judgment." *Fam. Home*, 525 F.3d at 827 (internal quotation marks omitted).

To support his motion, Plaintiff explains that recently disclosed information reveals that there may be additional, relevant documentation of misconduct by Aldridge and other Vancouver police officers that shows a practice of violating citizens' Fourth Amendments rights. Dkt. 44. Such evidence would be highly relevant to the City's *Monell* liability for a violation of Plaintiff's constitutional rights if there were an underlying Fourth Amendment violation. However, the evidence that Plaintiff seeks additional time to discover and review would have no effect on the Court's present analysis of (1) whether probable cause existed for the arrests in this case, or (2) whether the City ratified a violation of Plaintiff's First Amendment rights. Therefore, because the evidence Plaintiff seeks will not affect the Court's analysis, the Court denies the motion to continue.

## IV. ORDER

Therefore, it is hereby **ORDERED** that Defendants' motion for summary Judgment (Dkt. 28) is **GRANTED in part** and **DENIED in part** as follows:

1    1.    Defendants' motion is **GRANTED** as to Plaintiff's claims predicated on 42

2    U.S.C. § 1983, abuse of process, and negligence. Those claims are **DISMISSED with**

3    **prejudice**.

4    2.    Defendants' motion is **DENIED** as to Plaintiff's state law false arrest, false

5    imprisonment, and CRPA claims.

6    3.    The Court declines to exercise supplemental jurisdiction over Plaintiff's

7    surviving state law claims and those claims are **DISMISSED without prejudice**.

8    4.    Plaintiff's motion to continue (Dkt. 44) is **DENIED**.

9    5.    The Clerk shall close this case.

10   Dated this 22nd day of May, 2017.

11

12
     _____
     BENJAMIN H. SETTLE
13   United States District Judge

14

15

16

17

18

19

20

21

22